**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 25-232-DLB**

**RUSTAM RASSUL**                                                                          **PETITIONER**

**v.**                              **MEMORANDUM OPINION AND ORDER**

**FIELD OFFICER DIRECTOR, et al.**                                          **RESPONDENTS**

\* \* \* \* \* \* \* \* \* \*

## I.    INTRODUCTION

This matter is before the Court on Petitioner Rustam Rassul's Petition for Writ of Habeas Corpus (Doc. # 1).  Respondents[1] having filed their Responses (Docs. # 5 and 6), and Petitioner having filed his Reply (Doc. # 7), this matter is now ripe for review.  For the following reasons, the Court will **grant** the Petition.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Petitioner Rustam Rassul is a native and citizen of Belarus.  (Doc. # 1 at 7).  He was born in the former Soviet Union in present-day Turkmenistan, later renouncing that citizenship and becoming a citizen of Belarus.  (*Id*.).  In 2020, Rassul claims he was subjected to persecution and abuse from the Belarusian government for his political views

---

[1]    Petitioner files this action against Erik Weiss, Acting Field Office Director of Enforcement and Removal Operations ("ERO"), Chicago Field Office, Immigration and Customs Enforcement ("ICE"); Todd M. Lyons, Acting Director, US Immigration and Customs Enforcement; Kristi Noem, Secretary, U.S. Department of Homeland Security ("DHS"); and Pamela Bondi, U.S. Attorney General, in their official capacities, respectively (collectively, "Respondents").  Petitioner additionally filed this action against James Daley, Jailer, Campbell County Detention Center.  Respondent Daley filed his Response, arguing that he is not Petitioner's legal or immediate custodian.  (Doc. # 6).  This is not disputed by Petitioner, and therefore, the Court will address only the Response filed by the other listed Respondents.  (*See* Doc. # 5).

1

and professional activities.  (*Id*.).  In his Petition, Rassul claims he was jailed, harassed, intimidated, surveilled, and even threatened by government officials for his "perceived disloyalty to the [Belarusian President Aleksandr Lukashenko] regime."  (*Id*. at 7–8).  Rassul claims the regime threatened not only him, but his wife and daughter.  (*Id*. at 8).  The tipping point for Rassul came in 2024, when the KGB contacted him and arranged a "meeting," which Rassul says in Belarus is "widely understood to signal imminent detention and torture."  (*Id*.).  Fearing further torment, Rassul, his wife, and his daughter left Belarus in 2024.  (*Id*.).

Rassul and his family arrived in the United States on or about April 10, 2025 at the Otay Mesa, California port of entry, where they were taken into custody by the Department of Homeland Security ("DHS") as part of asylum screening.  (Doc. # 5 at 2; Doc. # 1 at 9).  They were then processed at a facility in Texas, where Rassul started the asylum process.  (Doc. # 1 at 9).  While in custody, Rassul underwent three separate interviews with asylum officers, all three of whom found that Rassul credibly established a fear of persecution if he and his family returned to Belarus.  (*Id*.).

On May 13, 2025, DHS issued Rassul a Notice to Appear in front of an Immigration Judge ("IJ") in Pearsall, Texas and released him pursuant to the asylum officers' findings of credible fear of being deported.  (Doc. # 5-3).  Rassul and his family were granted parole by DHS two days later on May 15, 2025.  (Doc. # 5-2).  His I-94 document indicates that his parole is to expire on May 15, 2026.  (*Id*.).  DHS listed the purpose for Rassul's parole as "INA 212(d)(5)(A)," which is the statute allowing a grant of parole to noncitizens for humanitarian or public interest reasons.  (*Id*.).  At some point prior to June 17, 2025, Rassul timely submitted his application for asylum.  (Doc. # 1 at 11; Doc. # 5-6 at 2).

2

On June 17, 2025, Rassul voluntarily reported for his first check-in with ICE in its Chicago Field Office. (Doc. # 1 at 12). Once there, ICE officers served him with an arrest warrant and took him into custody. (Doc. # 5 at 2). Rassul was then transferred from Chicago to Campbell County, Kentucky, where he remains detained to date. (Doc. # 1 at 14; Doc. # 5 at 2).

Following his arrest and transfer to Kentucky, Rassul went through asylum proceedings in front of an IJ. (Doc. # 1 at 16). On September 29, 2025, the IJ issued an opinion denying Rassul asylum and other sought relief and ordered his removal to Belarus. (*See* Doc. # 5-6). Rassul timely appealed the IJ's decision to the Board of Immigration Appeals, where it is pending to date. (Doc. # 1 at 16). His removal order has been stayed indefinitely, pending the resolution of his asylum appeal. (*Id*.).

On December 26, 2025, Rassul filed the instant Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241. (Doc. # 1). In his Petition, Rassul argues that he is being unlawfully detained at the Campbell County Detention Center in Newport, Kentucky and requests that the Court order his immediate release or, in the alternative, that he receive a "prompt individualized custody hearing." (*Id*. at 31–33). On December 30, 2025, the Court directed Respondents to respond to the Petition. (Doc. # 4). Respondents having filed their Responses (Docs. # 5 and 6), and Rassul having filed his Reply (Doc. # 7), this matter is ripe for the Court's review.

III.    **ANALYSIS**

   **A. Relevant Framework**

Rassul brings this Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241. At its core, habeas provides "a remedy for unlawful executive detention" *Munaf v. Geren*,

3

553 U.S. 674, 693 (2008), available to "every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004). The "typical remedy for such detention is, of course, release." *Munaf*, 553 U.S. at 693. Such relief "may be granted by the . . . district courts . . . within their respective jurisdictions." 28 U.S.C. § 2241(a). The Supreme Court has recognized that habeas relief extends to noncitizens. *See Rasul v. Bush*, 542 U.S. 466, 483 (2004) ("[Alien] Petitioners contend that they are being held in federal custody in violation of the laws of the United States . . . Section 2241, by its terms, requires nothing more."). Enacted in 1952, the Immigration and Nationality Act ("INA") consolidated previous immigration and nationality laws and now contains "many of the most important provisions of immigration law." U.S. Citizenship and Immigration Services, *Immigration and Nationality Act* (July 10, 2019), https://www.uscis.gov/lawsandpolicy/legislation/immigrationandnationalityact#:~:text=The%20Immigration%20and%20Nationality%20Act,the%20U.S.%20House%20of%20Representatives. Relevant to Rassul's Petition, Congress has established two statutes, codified in Title 8, which govern detention of noncitizens pending removal proceedings—8 U.S.C. §§ 1225 and 1226.

The first statute, 8 U.S.C. § 1225 is titled "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing." It states, in pertinent part:

> **(b)** **Inspection of applicants for admission**
>
> **(2)** **Inspection of other aliens**
>
> **(A)** **In general**
>
> Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that

an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229(a) of this title.

8 U.S.C. § 1225(b)(2)(A).  Important to note, for purposes of this provision, "an alien who is an applicant for admission" is defined as an "alien present in the United States who has not been admitted or who arrives in the United States."  8 U.S.C. § 1225(a)(1).

Respondents' Response hinges on the idea that Rassul is subject to § 1225(b)(2) as opposed to § 1226.  Rassul does not contend that § 1226 is the applicable law either. The Court finds that § 1226 is not appropriate in Rassul's case.  However, the Court also finds that § 1225(b)(2) does not apply to Rassul.  The reason for this is simple—Rassul falls under one of the three articulated exceptions in § 1225(b)(2)(B)(ii) because he is a noncitizen who was arriving in the United States seeking asylum, which is an exact situation imagined by § 1225(b)(1).  Section 1225(b)(2) serves as a catch-all provision of the INA, whereas § 1225(b)(1) is meant to apply to those noncitizens who are arriving in the United States for reasons such as seeking asylum.

**B. Parole**

There are specific procedures accorded to noncitizens like Rassul who come to the United States seeking asylum, articulated in § 1225(b)(1)(A)(ii).  This section provides that a noncitizen who arrives in the United States and indicates they want to apply for asylum status for fear of persecution shall be referred to an asylum officer for an interview to determine if the noncitizen has a credible fear of persecution.  8 U.S.C. § 1225(b)(1)(A)(ii).  "If the officer determines at the time of the interview that an alien has a credible fear of persecution . . ., the alien shall be detained for further consideration of the application for asylum."  *Id*. § 1225(b)(1)(B)(ii).

A key alternative to detention in the immigration context is the issuance of parole. Irrespective of which section of § 1225 covers the detention, applicants for admission may be temporarily released on parole "for urgent humanitarian reasons or significant public benefit."  8 U.S.C. § 1182(d)(5)(A); *see also Jennings v. Rodriguez*, 583 U.S. 281, 288 (2018) (quoting 8 U.S.C. § 1182(d)(5)(A)).  "Such parole, however, 'shall not be regarded as an admission of the alien.'"  *Jennings*, 583 U.S. at 288.

The implementing regulation on parole of aliens into the United States is codified at 8 C.F.R. § 212.5.  This section of the Code of Federal Regulations outlines who can and cannot be given parole, the circumstances that allow for the grant of parole, the conditions of parole, and—most importantly for this case—the termination of parole.  8 C.F.R § 212.5(a)–(e).  Parole of aliens may be terminated either automatically or upon written notice from the appropriate officials.  *Id*. § 212.5(e).  Parole terminates automatically without notice when the noncitizen either departs the United States or when the parole period expires.  *Id*. § 212.5(e)(1).  Conversely, if the purpose of parole is accomplished or an officer finds the humanitarian reasons nor public benefit warrants the noncitizen's continued presence in the United States, "parole shall be terminated upon written notice to the alien and he or she shall be restored to the status that he or she had at the time of parole."  *Id*. § 223.5(e)(2)(i).  Put another way, "[u]nder the governing regulation, [§ 1182(d)(5)(A)] parole may be terminated only if the purpose of parole is accomplished, or humanitarian reasons and the public benefit no longer warrant parole." *Loaiza Arias v. LaRose*, No. 3:25-cv-02595-BTM-MMP, 2025 WL 3295385, at *3 (S.D. Cal. Nov. 25, 2025).

Rassul's principal contention is that his detention is unconstitutional because DHS never effectively terminated his parole prior to ICE detaining him.  (Doc. # 1 at 24–27). He asserts that he never received an effective written notice of termination of parole, which renders his current detention unconstitutional.  (Doc. # 7 at 8).  Respondents first claim that the INA does not require any formal hearing or adjudication to terminate parole. (Doc. # 5 at 8).  And even if the statute does require notice, Respondents contend they provided Rassul with two separate notices of termination of his parole in the forms of the May 13, 2025 Notice to Appear (Doc. # 5-3) and the June 17, 2025 Arrest Warrant (Doc. # 5-5).[2]  (Doc. # 5 at 10, 12).

To start, the Court finds that neither requirement for automatic termination of parole had occurred at the time Rassul was detained.  Obviously, Rassul was still present in the United States when he was arrested.  Further, Rassul had nearly eleven months before his parole expired at the time he was arrested by ICE.  (Doc. # 5-2).  Because Rassul's parole does not automatically terminate, Respondents need to show they provided Rassul written notice of the termination of his parole.  They have failed to do so.

Respondents' three termination theories are not convincing.  First, the Court rejects Respondents' idea that no notice is required before parole may be terminated. Rassul has a significant interest in his own liberty, such that due process must be accorded before that liberty is stripped from him.  *Zadvydas*, 533 U.S. at 693–94 ("But

---

[2]     Respondents also claim that DHS's decision to terminate Rassul's parole is not within the purview of this Court.  (Doc. # 5 at 12).  That point is immaterial because that is not what Rassul asks the Court to do here.  A plain reading of the Petition reveals that Rassul is looking for this Court to overturn government action that he believes infringe on his rights under the Constitution. The Court is not being asked to overturn DHS's alleged decision to revoke parole or anything of the sort.  The Court certainly *can* review petitions for habeas corpus and will do so in this case. *See Zadyvdas v. Davis*, 533 U.S. 678, 687 (2001).

once an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."). Further, 8 C.F.R. § 212.5 would have no functional purpose if Respondents' contention is correct. The C.F.R. section is the means by which the INA is to be implemented and 8 C.F.R. § 212.5 calls for written notice that the parole is being terminated. 8 C.F.R. § 212.5(e)(2)(i).

Having dispatched Respondents' threshold theory, the Court moves to Respondents' theory that DHS's May 13, 2025 Notice to Appear (Doc. # 5-3) provided notice of termination of Rassul's parole.[3] That is factually impossible. Rassul was granted parole on May 15, 2025, two days after the Notice to Appear was issued. (Doc. # 5-2; *see also* Doc. # 5-3). It follows logically that something cannot be rescinded before it is even granted.

Finally, Respondents contend that the June 17, 2025 Arrest Warrant (Doc. # 5-5) put Rassul "on notice" of the termination of his parole. (Doc. # 5 at 12). Respondents maintain that the arrest warrant is a "clear and unequivocal notice that [Rassul's] physical presence in the interior of the United States is no longer permitted and that he is being returned to the same removal process as when he first arrived at the port of entry[.]" (*Id.*). Rassul disagrees that the Arrest Warrant was a charging document because it did not "purport to terminate parole, does not reference § 212.5(e), does not contain parole-termination findings, and does not provide notice that parole is being revoked." (Doc. # 7 at 7). Further, he maintains that arrest authority and parole termination authority

---

[3]     Respondents do not directly address this theory in their Response. However, in an email correspondence with Senator Richard Durbin produced by Rassul in his Reply, DHS indicated that it viewed the issuance of the May 13, 2025 Notice to Appear as a charging document that effectively terminated Rassul's parole. (Doc. # 7 at 18).

are two legally distinct concepts and that an arrest warrant does not serve the same legal purpose as a notice of parole termination.  (*Id.*).

The question for the Court, then, is whether the Arrest Warrant would have put Rassul on notice that his parole status was being terminated.  The Court finds that it did not for several reasons.  First, the Arrest Warrant does not mention Rassul's parole.  Reading the Warrant on its face, there is no language that would indicate to Rassul that anything was happening to his parole status.  The Warrant does not include language that explicitly states that his parole status was being terminated.  (Doc. # 5-5).  The Warrant does not make any mention of Rassul's parole.  (*Id.*).  Given that Rassul contends he complied with ICE and DHS's directives while his asylum application was pending, he certainly would not have known his parole status was in jeopardy without explicit, written notice at the time of his arrest.  There is nothing in the record that allows the Court to conclude that DHS made a "case-by-case assessment" required to terminate Rassul's parole. *Mata Velasquez v. Kurzdorfer*, 794 F. Supp. 3d 128, 146 (W.D.N.Y. 2025).

Further, the record does not reflect that Rassul received any charging document that would have put him on notice of the termination of his parole with the Arrest Warrant.  A "charging document" is defined as "the written instrument which initiates a proceeding before an Immigration Judge."  8 C.F.R. § 244.1.  Listed as examples of charging documents are Notices to Appear, Notices of Referral to an Immigration Judge, and Notices of Intention to Rescind and Request for Hearing by an Alien.  *Id.*  Rassul claims he received no such document when he was arrested, and Respondents do not claim to have served him with one.  (Doc. # 1 at 12; Doc. # 5).  Further, the C.F.R. provides three specific examples of charging documents.  8 C.F.R. § 244.1.  I-200 Arrest Warrants—

9

immigration arrest warrants that order ICE officers to arrest an alleged alien—are not on the list.  If these documents were intended to have the same effect as a charging document, they would be listed as a charging document by the regulation.

Because the Arrest Warrant was short on any actionable language and ICE provided no additional charging document, the Court finds the June 17, 2025 Arrest Warrant did not provide effective written notice of the termination of Rassul's parole, in violation of the 8 U.S.C. § 1182(d)(5)(A).  Therefore, Rassul was still on parole when he was arrested and detained by ICE on June 17, 2025.

### C. Due Process

Because the Court has concluded that Rassul was held in violation of his parole under the INA, the Court must now determine whether his current detention violates his due process rights.  Respondents did not address this issue in their Response.

The Fifth Amendment provides, in pertinent part, that no person shall be "deprived of life, liberty, or property, without due process of law[.]"  U.S. Const. amend. V.  The Supreme Court has repeatedly held that the Due Process Clause extends to all persons, regardless of citizenship status.  *See A.A.R.P. v. Trump*, 605 U.S. 91, 94 (2025) ("[T]he Fifth Amendment entitles aliens to due process of law in the context of removal proceedings." (quoting *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025))).  To determine whether a detainee's due process rights have been violated, courts apply a three-part balancing test to weigh

> (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the United States' interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

10

*Mathews v. Eldridge*, 424 U.S. 319, 321 (1976).

It is undisputed that Rassul, having been granted parole already, has a cognizable private interest in avoiding detention without an opportunity for a hearing. *See Hamdi*, 542 U.S. at 531 (affirming "the fundamental nature of a citizen's right to be free from involuntary confinement by his own government without due process of law[.]"). Indeed, "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause[.]" *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992); *see also Zadvydas*, 533 U.S. at 690 ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the very liberty that [the Due Process Clause] protects."). Our immigration law has long recognized that noncitizens have an interest in freedom from detention and removal without an individualized hearing. *See Yamataya v. Fisher*, 189 U.S. 86, 101 (1903). Further, the Supreme Court has previously required individualized hearings for deprivations of interests less fundamental than Enriquez's interest in freedom from detention. *See Goldberg v. Kelly*, 397 U.S. 254, 268 (1970) (requiring an individualized hearing prior to the termination of welfare benefits).

Second, the risk of erroneous deprivation of that interest is high if Rassul is not afforded a hearing on his parole. *See Edahi v. Lewis*, No. 4:25-cv-129-RGJ, 2025 WL 3466682, at *14 (W.D. Ky. Nov. 27, 2025) (holding that detention "without any individualized assessment, leads to a high risk of erroneous deprivation of an individual's liberty interest") (citation omitted); *Yao v. Almodovar*, No. 25 Civ. 9983 (PAE), 2025 WL 3653433, at *11 (S.D.N.Y. Dec. 17, 2025) (finding that ICE's "discretion-free detention of [the petitioner] abridged his rights under [8 U.S.C.] § 1226 and violated due process") (citations omitted). To date, Rassul has not had any sort of individualized determination

11

on his parole status based on his family's circumstances since its initial granting. Thus, Rassul's present detention creates a high risk of an erroneous deprivation of his liberty interest. Accordingly, the second *Mathews* factor favors Rassul.

As to the third factor, Respondents have not put forth any argument whatsoever advocating for the United States' interest. The Court, on its own, concludes that the United States likely has a strong interest in immigration proceedings, but certainly, the "existing statutory and regulatory safeguards" which this Court discussed at length above, "serve the governmental interest in public safety." *Barrera v. Tindall*, No. 3:25-cv-541-RGJ, 2025 WL 2690565, at *7 (W.D. Ky. Sep. 19, 2025) (quoting *Günaydin v. Trump*, No. 25-cv-01151, 2025 WL 1459154, at *10 (D. Minn. May 21, 2025)). Accordingly, all three factors weigh in favor of Rassul. As other courts have concluded, Rassul's detention violates the due process rights afforded to him by the Fifth Amendment and he is therefore entitled to be released from ICE custody.

## IV.    CONCLUSION

Accordingly, for the reasons stated herein, **IT IS SO ORDERED** as follows:

(1)    Petitioner's Petition for Writ of Habeas Corpus (Doc. # 1) is **GRANTED**;

(2)    Respondents are **ORDERED** to **immediately release** Petitioner, subject to any conditions that existed under Petitioner's parole; and

(3)    Respondents shall file a Status Report with this Court **on or before April 9, 2026** to certify compliance with this Order.

This 26th day of March, 2026.



Signed By:

*David L. Bunning*

**Chief United States District Judge**

G:\Judge-DLB\DATA\ORDERS\Cov2025\25-232 MOO re Habeas Petition.docx